UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
5:17-cv-73-FDW

| | | |
|---|---|---|
| COBEY LAKEMPER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | **ORDER** |
| | ) | |
| GEORGE T. SOLOMON, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————— | ) | |

**THIS MATTER** comes before the Court on the following motions: a Motion for

Summary Judgment and a Motion to Seal Document, by Defendants Levi Brothers, Benjamin A.

Carver, FNU Chester, FNU Dula, Kenneth Lassiter, Christopher Rich, George T. Solomon, and

Larry Swain.  (Doc. Nos. 73, 77).  Also pending are the following motions by Plaintiff: "Motion

for Leave to File Supplemental Pleading," (Doc. No. 44); "Motion to Compel Discovery," (Doc.

No. 51); "Motion Rule 46 Objecting to Restrictions on Discovery," (Doc. No. 55), "Motion

Seeking Order Requiring All Discovery," (Doc. No. 62), "Motion Requesting Immediate Ruling

on Discovery," (Doc. No. 69), "Motion to Compel Defendants to Transport Plaintiff to Library

Facility," (Doc. No. 70).

I.      **BACKGROUND**

A.      **Procedural Background**

Pro se Plaintiff Cobey LaKemper is a North Carolina prisoner incarcerated at Tabor

Correctional Institution in Tabor City, North Carolina.  On April 25, 2017, Plaintiff filed this

action pursuant to 42 U.S.C. § 1983, naming as Defendants: (1) Kenneth Lassiter, identified as the current Director of Prisons for the North Carolina Department of Public Safety ("NCDPS"); (2) George Solomon, identified as the former NCDPS Director of Prisons; (3) Christopher Rich, identified as the Chief Security Risk Group ("SRG") Coordinator for NCDPS; (4) Levi Brothers, identified as an SRG Correctional Officer at Pasquotank Correctional Institution at all relevant times; (5) Larry Swain, identified as an SRG Correctional Officer at Pasquotank Correctional Institution at all relevant times; (6) Benjamin A. Carver, identified as the Former DHO/Assistant Superintendent at Alexander Correctional Institution; (7) FNU Chester, identified as an SRG Correctional Officer at Alexander Correctional Institution at all relevant times; and (8) FNU Dula, identified as a Correctional Officer at Alexander Correctional Institution at all relevant times. (Doc. No. 1). Plaintiff filed an Amended Complaint on July 27, 2017. (Doc. No. 17).

Plaintiff alleged in his Amended Complaint that his Fourteenth Amendment and First Amendment constitutional rights are being violated because he was wrongly classified as being in a security threat group ("STG") (i.e., a gang member) while in prison, and that Defendants have retaliated against him in various forms for filing grievances. Plaintiff seeks compensatory and punitive damages, as well as declaratory and injunctive relief. (Doc. Nos. 1, 17).

On September 29, 2017, this Court conducted its frivolity review, dismissing Plaintiff's Fourteenth Amendment and First Amendment claims as to his security classification and allowing Plaintiff to proceed with his remaining retaliation claim.[1] (Doc. No. 18). Plaintiff subsequently filed a motion for reconsideration, contending that he raised, in his Amended

---

[1] The Court also construed the Amended Complaint as bringing an Eighth Amendment claim, and the Court dismissed that claim on initial screening, but Plaintiff asserts in his response to the summary judgment motion that he never intended to bring an Eighth Amendment claim. (Doc. No. 85 at 3-4).

Complaint, a stand-alone First Amendment claim based on his allegation that Defendants rejected and then destroyed some of Plaintiff's incoming and outgoing mail to and from family and friends without providing notice or an opportunity to appeal. Plaintiff also claimed that he intended to bring a Fourteenth Amendment "equal protection" claim and a Fifth Amendment double jeopardy claim. (Doc. No. 20). On November 7, 2017, the Court granted Plaintiff's motion for reconsideration in part, allowing him to proceed on a stand-alone First Amendment claim based on a violation of his First Amendment right to send and receive mail. (Doc. No. 22). Plaintiff thereafter filed another motion for reconsideration, claiming that this Court failed to rule on "Plaintiff's Fourteenth Amendment procedural due process challenge regarding" the alleged confiscation and destruction of personal mail. (Doc. No. 27). The Court entered an order dated May 7, 2018, stating that it would allow Plaintiff to pursue this Fourteenth Amendment claim. (Doc. No. 40).

On January 12, 2018, Defendants filed an Answer. (Doc. No. 30). On March 7, 2018, this Court entered a Scheduling Order, directing that dispositive motions be filed no later than August 5, 2018. (Doc. No. 33). The Court granted several extensions for the parties to file dispositive motions, and on October 31, 2018, Defendants filed the pending summary judgment motion. (Doc. No. 73).

On November 5, 2018, this Court entered an order in accordance with <u>Roseboro v. Garrison</u>, 528 F.2d 309 (4th Cir. 1975), advising Plaintiff of the requirements for filing a response to the summary judgment motion and of the manner in which evidence could be submitted to the Court. (Doc. No. 79). Plaintiff filed a response to the summary judgment motion on December 14, 2018. (Doc. No. 85).

B.    **Factual Background**

### 1.    Plaintiff's Evidence

Plaintiff alleges that, since his incarceration in February 2014, he has been classified as an associate of multiple security risk groups (SRGs).  Plaintiff alleges that Defendants have retaliated against him for filing grievances in the following manner: by wrongly assigning him to these custody classifications; by confiscating, delaying, tampering with, and/or destroying some of his outgoing and incoming mail; by confiscating books; and by making up disciplinary infractions against him.  Plaintiff admits to having two tattoos and acknowledges he has been informed that the tattoos form the basis of his SRG custody classifications, rather than any grievances.

### 2.    Defendants' Evidence

In support of their motion, Defendants have submitted the affidavits of Cameron Gaddy (not a party), with an attached exhibit; Defendant Rich, with an attached exhibit; Defendant Carver, with an attached exhibit; Defendant Swain, with attached exhibits; Defendant Chester, with attached exhibits; and Defendant Dula, with an attached exhibit.  (Doc. No. 75).

### a.   Relevant NCDPS Policy

NCDPS's Security Manual states that its policy is to provide programs and incentives for inmates validated as Security Threat Group ("STG") members to sever their affiliations with STGs, with the goal being the disassociation with STG activities.  (Doc. No. 75-2 at ¶ 6: Rich Aff.; Doc. No. 76).  Facility intelligence officers in the field initially identify an inmate as a security threat group member through extensive research and documentation of member behavior.  Facility intelligence officers are specifically trained in gathering intelligence related to gang activity.  A facility intelligence officer investigates at the facility level.  The facility head, and then ultimately the division office, reviews the investigation.  Inmates are "validated" in

three different levels, with level three being the highest or most dangerous level. Before an inmate can be "validated," he receives notification of his validation, along with the opportunity to dispute the validation. (<u>Id.</u> at ¶ 7).

The NCDPS Security Manual, Subject: Security Threat Group, provides that a Security Threat Group Associate is defined as "[a]ny inmate or other person who, though not validated as a Security Threat Group Member, is known to participate in or support the illegal or illicit activities of a STG/STI. An associate may also be any inmate that is being watched or observed to gather evidence or intelligence to support validation as an STG/STI member." (<u>Id.</u> at ¶ 8).

The NCDPS Security Manual, Subject: Security Threat Group provides as follows:

> (F) All incoming and outgoing mail (except legal mail) should be opened and read by the Administrator, Facility Intelligence Officer or designee. Such mail shall be subject to rejection, non-delivery, and photocopying by the Administrator/designee if it threatens the safety of staff, facility, inmates, or the community. Legal mail should be managed according to existing DOP policy and procedures.
> (G) Severity (Threat Level 1, 2, 3 and Associate) members/individuals will be required to submit to urine testing as designated by the Administrator/Superintendent or Intelligence Officer.
> (H) Severity (Threat Level 1, 2, 3 and Associate) members/individuals and their property will be searched at least every seven days.

(<u>Id.</u> at ¶ 8; Doc. No. 75-5 at ¶ 8: Chester Aff.).

The NCDPS Inmate Use of the Mail policy provides that all inmate mail is subject to inspection by a mailroom officer, and facility heads may also provide for the inspection of outgoing mail. The inspection is intended to prevent the inmate from receiving or sending any mail that threatens to undermine the facility's security and order, or mail with contraband or other material that cannot be lawfully sent through the mail. The Inmate Use of the Mail policy also provides rules related to the inspection of legal mail and specifically provides a process for an inmate to appeal the disapproval of any inmate correspondence and/or its contents. (Doc. No.

75-4 at ¶ 9: Swain Aff. & Ex. A; Doc. No. 75-5 at ¶ 9).  Therefore, if an inmate appeals a disapproval, the inmate and addressee/sender, along with the facility head, will be copied on the Director's Correspondence Review Committee on whether it will reverse the decision to withhold mail from that inmate.  (Doc No. 75-4, Ex. A, Section .0310(c)(4) at p. 7).

### b.  Plaintiff's SRG Status

Defendants' summary judgment materials show that Plaintiff was transferred from Pasquotank Correctional Institution to Alexander Correctional Institution on June 15, 2016, and he was then transferred from Alexander to Scotland Correctional Institution on July 12, 2017. (Doc. No. 75-4 at ¶ 10: & Ex. B).  On April 22, 2016, Defendant Swain discovered Plaintiff had tattoos of a Celtic cross with SS lightning bolts, a hooded person in front of flames, and chains with a cross (later found to be the KKK Blood Drop Cross).  Plaintiff was placed on the associate watch list (not validated) for Aryan Nation for his tattoo of the Celtic cross with the SS lightning bolts.  (Id. at ¶ 11 & Ex. C).  On July 18, 2018, Cameron Gaddy, the Scotland Security Risk Group Intelligence Officer, changed Plaintiff's SRG affiliation from Aryan Nation to KKK when it was discovered that the chains with a cross tattoo was the KKK Blood Drop Cross.  (Doc. No. 75-1 at ¶ 7: Gaddy Aff.).  Acoording to Defendants, this identification explains why Plaintiff has had multiple SRG classifications (Aryan Nation and KKK).

While in NCDPS custody, Plaintiff made formal complaints about his control status and SRG designation, and prison officials addressed those complaints through the NCDPS Administrative Remedy Procedure.  (Doc. No. 75-5 at ¶ 18 & Ex. B).  Plaintiff requested to have his tattoo removed while at Scotland, but Scotland officials refused to transfer Plaintiff to an

outside tattoo business due to security concerns.[2]

There is no time limit for how long an inmate may remain on the associates list consistent with the applicable NCDPS policy. In general, for an inmate to be considered for possible removal from the list, he would need to show signs of positive behavior, i.e., remain infraction-free for at least a year, refrain from drug activities, and not possess a cell phone. (Doc. No. 75-1 at ¶ 10). Plaintiff received an infraction on December 3, 2017, for Possession Audio/Video/Image Device (A16) and Substance Possession (A12). (Id. at ¶ 18; Doc. No. 75-3: Carver Aff., Ex. B). Plaintiff was placed on control status on December 11, 2017, and he was released to modified housing on June 1, 2018. The monitoring of Plaintiff resumed on June 1, 2018, due to him being placed in regular population. (Doc. No. 75-1 at ¶ 10 & Ex. A). In his role as the Security Risk Group Intelligence Officer ("SRGIO") at Scotland, Cameron Gaddy continued to monitor Plaintiff's activity due to the lack of time he had been housed in regular population. (Id. at ¶ 10).

c. **Plaintiff's Disciplinary Infractions**

Plaintiff has received multiple disciplinary infractions while in NCDPS custody. According to Defendants, the prison personnel who reviewed and upheld the disciplinary infractions did not know about Plaintiff's grievances against the moving Defendants. (Doc. No. 75-3 at ¶¶ 8, 11 & Ex. C; Doc. No. 75-7 at ¶ 6: Dula Aff. & Ex. A). Plaintiff's infractions include: an A18 infraction for making false allegations on staff (for an offense that occurred on June 1, 2016); an A99 infraction for an attempt class A offense; and a C11 infraction for

---

[2] Defendants contend that even inmates in general population without a security alert designation would generally not be allowed to leave a correctional facility for such a request, for obvious safety reasons. (Id. at ¶ 20).

misuse/unauthorized use of phone/mail (for offenses that occurred on May 3, 2017).  Prison officials investigated these infractions and imposed disciplinary actions in accordance with NCDPS policy.  (Doc. No. 75-3 at ¶¶ 6-11 & Ex. C).  Plaintiff appealed these matters and they were upheld on appeal.  (Id. at ¶ 11; see also Doc. No. 75-7 at 7).

The A18 infraction related to Plaintiff's statements that Defendant Brothers had brought drugs into the prison facility.  (Doc. No. 75-3 at ¶ 8).  When Plaintiff was given an opportunity to address the A18 infraction during the related investigation, he provided no evidence of his innocence and did not deny his conduct, nor did he raise retaliation concerns.[3]  (Id.).  Defendant Carver, the disciplinary hearing officer who reviewed the infraction and determined the appropriate discipline, did not have access to records relating to grievances filed by Plaintiff and did not know that Plaintiff had filed grievances against the moving Defendants before Plaintiff was charged with the A18 infraction.  (Id. at ¶ 11).  Plaintiff received his A99 and C11 infractions after attempting to have a cell phone and drugs brought into the prison facility.  (Doc. No. 75-7 at ¶ 6 & Ex. A).  Again, the officer investigating this misconduct did not know about Plaintiff's grievances about his SRG status at the investigation's outset.  (Id.).

### d.  Defendants' Response to Plaintiff's Claims of Other Retaliatory Acts

Defendants contend that, at all relevant times, Plaintiff's mail has been processed in accordance with relevant NCDPS mail policy.  Defendants deny delaying, switching, or withholding Plaintiff's mail or subjecting Plaintiff to heightened monitoring in retaliation for

---

[3] Defendants also contend that Plaintiff's witness statement during the prison's investigatory review of the infraction include similar statements about Officer Swain.  Defendants have not provided a record citation supporting this assertion, and no such statement appears to be included in Plaintiff's witness statement; therefore, the Court does not consider it in ruling on the summary judgment motion.

grievances he filed.  Defendants contend that, instead, the monitoring of Plaintiff's mail was conducted in accordance with NCDPS policy related to mail use and monitoring of inmates with certain SRG statuses.  (Doc. No. 75-5 at ¶¶ 8-9; Doc. No. 75-2 & Ex. A at page 1700-9; Doc. No. 75-4 & Ex. A).  Defendants further contend that Plaintiff's property was searched in accordance with the Security Threat Group policy.  (Doc. No. 75-4 at ¶¶ 12, 13).

Defendants note that, as part of his claim, Plaintiff alleges that Defendant Swain failed to put his letters back into the envelopes so that he received an empty envelope.  Defendants assert that prison officials process and search letters one at a time, and they put the contents back in the envelope unless the contents are deemed undeliverable.  If the contents are deemed undeliverable, the inmate is notified with a disapproval form.  (Id. at ¶ 16).  Defendants deny making threatening or harassing remarks to Plaintiff in any form, and they deny taking retaliatory action against Plaintiff in violation of his constitutional rights or state or federal law.  (Doc. No. 75-4 at ¶¶ 17, 19; Doc. No. 75-3 at ¶ 12; Doc. No. 75-2 at ¶ 11; Doc. No. 75-5 at ¶¶ 15, 21; Doc. No. 75-7 at ¶¶ 11, 13).  As to Plaintiff's allegations about being placed in restrictive housing, Defendants contend that, consistent with NCDPS policy, Plaintiff was placed in restrictive housing for attempting to introduce contraband into the facility—not in retaliation for any grievances Plaintiff submitted while confined at Alexander.  (Doc. No. 75-6 at ¶ 16 & Ex. A).

Further, on August 22, 2016, Plaintiff filed Grievance No. 4870-2016-KPODB-03435 and on April 6, 2017, he filed Grievance 4870-KPODE-02611, complaining about Alexander staff retaliating against him for filing grievances.  Plaintiff appealed both these grievances to the Inmate Grievance Resolution Board, which concluded for both that Plaintiff was not treated unfairly or outside the scope of correctional policies and procedures.  (Doc. No. 75-6, Ex. B at

Bates-stamped pp. 003-008, 017-022).  As to Plaintiff's allegations that Defendant confiscated items from his mail, Defendants note that Plaintiff's DC-160s (an inmate's personal property inventory form) show that he has possessed numerous books, magazines, mail, and other personal property.  <u>See</u> (Doc. No. 75-6, Ex. C).

## II.     STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A fact is material only if it might affect the outcome of the suit under governing law.  <u>Id.</u>

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party.  The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial."  <u>Id.</u> at 322 n.3.  The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment.  <u>Id.</u> at 324.  The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson</u>, 477 U.S. at 248; <u>accord</u> <u>Sylvia Dev. Corp. v. Calvert County, Md.</u>, 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any

inferences from the evidence in the light most favorable to the nonmoving party.  Anderson, 477

U.S. at 255.  "'Where the record taken as a whole could not lead a rational trier of fact to find for

the nonmoving party, there is no genuine issue for trial.'"  Ricci v. DeStefano, 129 S.Ct. 2658,

2677 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

### III.    DISCUSSION

### A.    Plaintiff's Claims against Defendants in their Official Capacities

First, to the extent that Plaintiff has sued Defendants in their official capacities, a suit

against a state official in his official capacity is construed as against the state itself.  Will v.

Michigan Dep't of State Police, 491 U.S. 58, 71 (1989).  It is well settled that neither a state nor

its officials acting in their official capacities are "persons" subject to suit under 42 U.S.C. §

1983.  Id.; see Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 690 n.55

(1978).

Moreover, the Eleventh Amendment generally bars lawsuits by citizens against non-

consenting states brought either in state or federal courts.  See Alden v. Maine, 527 U.S. 706,

712-13 (1999); Seminole Tribe of Fla. v. Fla., 517 U.S. 44, 54 (1996).  Although Congress may

abrogate the states' sovereign immunity, it has not chosen to do so for claims under 42 U.S.C. §

1983.  See Quern v. Jordan, 440 U.S. 332, 343 (1979).  North Carolina has not waived its

sovereign immunity by consenting to be sued in federal court for claims brought under 42 U.S.C.

§ 1983.  See generally Mary's House, Inc. v. North Carolina, 976 F. Supp. 2d 691, 697

(M.D.N.C. 2013) (claim under 42 U.S.C. § 1983 barred by sovereign immunity of North

Carolina which had not been waived).  Accordingly, Defendants are entitled to summary

judgment as to Plaintiff's claims against them in their official capacities.

### B.    Plaintiff's Claims against Defendants in Their Individual Capacities

**1. Plaintiff's First Amendment Mail Claim**

The Court first addresses Plaintiff's claim that Defendants Brothers, Dula, Swain, and Chester violated his First Amendment right to send and receive personal mail while Plaintiff was incarcerated at Pasquotank and Alexander Correctional Institutions. Plaintiff brings this as both a stand-alone claim, and he also brings it as a retaliation claim, asserting that Defendants retaliated against him for filing grievances against them by delaying, interfering with, confiscating, and destroying much of his personal mail sent and received. Finally, Plaintiff also attempts to bring this as a Fourteenth Amendment due process claim, based on his contention that he was not given a proper due process hearing to address his mail claim.

While the First Amendment protects the rights of inmates to send and receive mail, this right is limited in the prison setting. See Thornburgh v. Abbott, 490 U.S. 401, 408 (1987). Prison policies allowing prison officials to open and inspect inmates' outgoing mail is "[w]ithout question . . . reasonably related to legitimate penological interests," and, therefore, constitutional. Altizer v. Deeds, 191 F.3d 540, 547-48 (4th Cir. 1999). Furthermore, courts have held that limited interruptions in mail and allegations that some mail was lost and/or not returned to an inmate are insufficient to state a constitutional claim. See Buie v. Jones, 717 F.2d 925, 926 (4th Cir. 1983) (stating that "a few isolated instances of plaintiff's mail being opened outside of his presence . . . were not of constitutional magnitude"); Lloyd v. MacNeish, No. 5:12-CT-3163-FL, 2015 WL 1391476, at **10-11 (E.D.N.C. Mar. 25, 2015) (stating that "[t]o the extent plaintiff alleges that some items of regular mail were either lost or returned to him," plaintiff failed to show a constitutional violation).

Next, as to Plaintiff's retaliation claim based on Defendants' alleged conduct of delaying, confiscating, destroying, and otherwise interfering with Plaintiff's First Amendment right to send

and receive personal mail, to recover on a First Amendment retaliation claim, Plaintiff must prove: (1) that he engaged in protected First Amendment activity, (2) that the defendants took some action that adversely affected his First Amendment rights, and (3) that there was a causal relationship between the protected activity and the defendants' conduct. Tobey v. Jones, 706 F.3d 379, 387 (4th Cir. 2013); Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 499 (4th Cir. 2005). To establish a causal connection, Plaintiff must show that the defendants knew he engaged in protected activity. Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998). "Knowledge alone, however, does not establish a causal connection" between the protected activity and the adverse action. Price v. Thompson, 380 F.3d 209, 213 (4th Cir. 2004). The causal element requires the plaintiff to show that the defendant knew about the protected activity and that there was a temporal proximity between the protected activity and the alleged retaliation suggesting a causal connection. Constantine, 411 F.3d at 501. The Fourth Circuit recently held that inmates have a clearly established First Amendment right to be free from retaliation for filing grievances. Booker v. South Carolina Dep't of Corrs., 855 F.3d 533, 546 (4th Cir. 2017).

In their summary judgment motion, Defendants contend that Plaintiff has provided no evidence to support his allegations and does not disclose the identity of the addressees or content of the alleged missing letters. Defendants further contend that the summary judgment evidence establishes that Plaintiff's mail was inspected pursuant to NCDPS's policies regarding mail; Plaintiff was never prevented from sending or receiving mail; and his mail was interrupted only when he violated policies or was suspected of violating policies. Defendants additionally contend that Plaintiff was given the opportunity to appeal any restrictions on his mail.

However, here, in his response to the summary judgment motion, Plaintiff has produced

13

evidence of more than merely "isolated" incidents of his mail being delayed or lost. Rather,

Plaintiff has produced evidence supporting his claim that, on numerous occasions, Defendants

intentionally, and in a retaliatory manner, interfered with, delayed, or destroyed Plaintiff's

personal mail. As supporting evidence of Plaintiff's mail claim, Plaintiff's mother Judy

Lakemper states, in a sworn affidavit:

> After Cobey was transferred to Pasquotank in 2014, his letters to me began arriving open and taped and postmarked many days after the date of the letter. I took notice of this since while Cobey was at Craven and Central Prison, prior to Pasquotank, his letters to me were neither taped or late. Sometime thereafter Cobey's letter began arriving even later, the delay between when he wrote them and when they were postmarked even greater, and some letters Cobey sent I never received at all. Cobey told me that SRG staff were retaliating against him for filing grievances against them, and one particular, a captain.
>
> After Cobey transferred to Alexander I mailed a greeting card to him containing ten original, single-copy family pictures on March 16, 2017. I sent them as a surprise, unaware at the time that two of the SRG guards there were harassing Cobey after he filed a grievance against them. After Cobey never received the card or pictures and he told me that the two guards kept them then destroyed them, I called Alexander and spoke with the assistant superintendent. I explained that the pictures were very special family pictures and that no other copies exist and asked that they please return the pictures to me if they did not intend to give them to Cobey, but neither Cobey or I were given the pictures.

(Doc. No. 85-4 at 3-4).

 Sam Dwiggins, an inmate at Alexander prison, has also submitted an affidavit in

response to the summary judgment motion, stating the following:

> In March 2017 I noticed C.O.s Dula and Chester start giving Cobey a hard time. In the hallway going to the dining hall two days before Cobey was put in the hole he ask[ed] C.O. Dula what he did with a card his mom sent, which Cobey said had a bunch of family pictures in it. C.O. Dula told Cobey they [were] in the trash compactor. Then he made the comment about the body of the girl visiting Cobey every week or two, and said he needed to holler at her himself since he liked white girls. That was on March 27, 2017.
>
> On March 28, 2017, the day before Cobey was put in the hole, two C.O.s came to search Cobey's cell while we were in the dorm. One of the C.O.s Blankenship flat out told Cobey that SRG staff told him to search Cobey's [] and make sure they found something to write him up for. Blankenship told Cobey

that he sure must have done something to piss them off. They took several half naked pictures of Cobey's girl and some vendor catalogs with half-naked ladies, all stuff he received legally through the mail. I got the same catalogs.

That same day going to chow, C.O. Chester was leaning against the wall as me and Cobey walked by. C.O Chester told Cobey he hoped that his girlfriends liked their letters saying it in a trouble-starting way. I asked Cobey what Chester was talking about and he said, "the dirty dog switched the contents of the envelopes of my letters to Angela and Katie." Cobey said ever since he filed a grievance against Dula and Chester they wouldn't leave him alone . . . ."

(Doc. No. 85-4 at 5-6).

Kenneth Allen Ball, an inmate at Alexander prison, has also submitted an

affidavit in response to the summary judgment motion, stating the following:

While chow was being run on March 27, 207, I witnessed a brief verbal exchange between Cobey Lakemper and C.O. Dula in the hallway in front of the chew hall. Cobey Lakemper asked C.O. Dula what he had done with a card filled with a bunch of pictures his mother had sent him. C.O. responded that they were in the trash compactor, and then said some lewd things about Cobey Lakemper's girlfriend. There were a lot of prisoners around when C.O. Dula said these things, and it was clear that he was hoping for an angry response from Cobey Lakemper.

(Doc. No. 85-4 at 8).

Finally, Plaintiff has submitted his own sworn affidavit, with allegations that,

after he filed grievances against Defendants Brothers, Dula, Swain, and Chester, he

noticed numerous occasions of long mail delays, missing mail, and mail sent out in empty

envelopes after mail was taken out of the envelopes. See (Doc. No. 85-4 at ¶¶ 2, 5, 11,

12, 17, 18, 34). He also asserts, under oath, that a unit manager told Plaintiff that if he

filed a grievance against Defendant Brothers, Brothers would "make [Plaintiff's] life

hell" if Plaintiff didn't drop the grievance, (id. at ¶ 3); that Brothers himself told Plaintiff

that he (Brothers) had shredded a letter that Plaintiff had sent to his sister, and that he

destroyed three other letters that Plaintiff had mailed to his family, (id. at ¶ 11); that after

Plaintiff filed a grievance against Alexander staff in March 2017, Defendants Chester and Dula "intercepted then switched the letters and other enclosures of three outgoing pieces of mail to my female friends," and that Defendant Chester "acknowledged" responsibility for this when Plaintiff's female friends informed him that they had all received correspondence and enclosures meant for one another, (id. at ¶ 17); that Chester later taunted Plaintiff about switching the letters to Plaintiff's female friends, (id. at 22); that Defendant Dula told Plaintiff that family photographs that Plaintiff's mother had sent him were "in the compactor," (id. at ¶ 18); and that after March 15, 2017, Defendants Chester and Dula withheld and destroyed 23 items of Plaintiff's incoming and outgoing mail to and from family and friends, (id. at ¶ 34).

The Court finds that Plaintiff has submitted sufficient evidence on summary judgment to raise a genuine issue of disputed fact as to his First Amendment mail claim, which includes a claim that Defendants Brothers, Dula, Swain, and Chester retaliated against Plaintiff for filing grievances by routinely delaying or confiscating his personal mail. Thus, the Court denies summary judgment to Defendants Brothers, Dula, Swain, and Chester on Plaintiff's stand-alone claim alleging that Defendants violated his First Amendment right to send and receive mail, as well as his retaliation claim based on the same conduct. Plaintiff's evidence, if believed, would show that on numerous occasions these Defendants abused their authority over Plaintiff by delaying his mail, switching up items in envelopes, removing items from his mail, and throwing some of his mail away. Moreover, Plaintiff's allegations, if believed, show that Defendants did these things both intentionally and vindictively, and they even taunted Plaintiff about it. Such conduct, if believed, is reprehensible, unprofessional, and violates Plaintiff's First Amendment right

to send and receive mail in the prison and it also qualifies as retaliation against Plaintiff for filing grievances against these officers.

The Court also finds that these Defendants are not entitled to qualified immunity as to this claim. Retaliation for filing grievances in the North Carolina prison system violates the First Amendment, and the law was clearly established when Defendants committed the conduct that Plaintiff alleges in this lawsuit. See Booker v. South Carolina De'pt of Corrs., 855 F.3d 533 (4th Cir. 2017) (finding that the law was clearly established as early as 2010 that retaliation for filing grievances violates the First Amendment). As to the remaining moving Defendants, Plaintiff's claim is dismissed as to them, as he has produced no evidence that these Defendants personally participated in the alleged violation of Plaintiff's First Amendment right to send and receive personal mail.

As to Plaintiff's attempt to bring his mail claim as a due process violation, however, Defendants will be granted summary judgment on this claim, as the evidence shows that Plaintiff was given the right to grieve, and did grieve, this claim through the administrative process.[4] The Court further notes, however, that, as to any First Amendment claim related to Plaintiff's legal mail, as opposed to personal mail, Defendants are entitled to summary judgment as to this claim. To state a claim for denial of access to the courts, the inmate must show actual injury or that a defendant's conduct hindered his efforts to pursue a legal claim. See Lewis v. Casey, 518 U.S. 343, 351-52 (1996); Michau v. Charleston Cnty., 434 F.3d 725, 728 (4th Cir. 2006). Here, Plaintiff has failed to allege any injury for the alleged mishandling of his legal mail. As

_____

[4] Moreover, as to Plaintiff's due process claim based on any alleged confiscation or destruction of his mail, this claim fails for the reasons discussed below related to his claim based on confiscation of personal property.

Defendants note, the prison's treatment of Plaintiff's mail has clearly not impeded his ability to litigate this action, as the docket entries show Plaintiff has been able to communicate with counsel and the Court at all relevant times during this case, including serving extensive discovery requests on Defendants.

For the reasons stated herein, Defendants are entitled to summary judgment as to Plaintiff's First Amendment claim as to his legal mail, as well as his Fourteenth Amendment due process claim, but the Court denies the summary judgment motion by Defendants Brothers, Dula, Swain, and Chester, as to Plaintiff's stand-alone First Amendment claim that Defendants violated Plaintiff's right to send and receive personal mail and his retaliation claim based on the same conduct.

### 2. Plaintiff's Fourth and Fourteenth Amendment Confiscation of Property Claims

Next, Plaintiff also appears to attempt to bring a claim of a violation of his Fourth and Fourteenth Amendment rights based on the alleged confiscation of property from his prison cell. Prisoners have no legitimate expectation of privacy in their cells or in their possessions; therefore, the Fourth Amendment is not applicable to searches of prison cells, nor does it protect the destruction of an inmate's personal property. Hudson v. Palmer, 468 U.S. 517, 525-526, 528 n.8 (1984). To the extent Plaintiff is asserting a claim that he was deprived of his property without due process, in violation of the Due Process Clause of the Fourteenth Amendment, Defendants are entitled to summary judgment as to this claim for the following reasons.

In Hudson, the Supreme Court held that an unauthorized intentional deprivation of property did not violate the Fourteenth Amendment due process clause if a meaningful post-deprivation remedy for the loss was available. 468 U.S. at 533. North Carolina law provides for an action for conversion. Wilkins v. Whitaker, 714 F.2d 4, 6 (4th Cir. 1983); see also Yates v.

Jamison, 782 F.2d 1182, 1185 (4th Cir. 1986) (reversing district court's award of relief for plaintiff's Section 1983 action for destruction of property concluding that, based on Parratt, because North Carolina provides an "adequate and meaningful post-deprivation remedy in the form of an action in state court . . . ," plaintiffs could not state a claim for relief under § 1983). Here, because a meaningful post-deprivation remedy for the loss was available to Plaintiff, Defendants are entitled to summary judgment as to Plaintiff's constitutional claims based on alleged confiscation of his property from his prison cell.

**3. Plaintiff's Fourteenth Amendment Due Process Claim Related to Plaintiff's Prison Infractions**

Plaintiff also appears to complain that he was wrongly charged with prison infractions and that he was not afforded due process of law before being found guilty of the infractions.  An inmate's burden in such a claim is high.  Courts have ruled that the alleged act of filing false charges does not in and of itself violate a prisoner's constitutional rights.  Freeman v. Rideout, 808 F.2d 949, 952-53 (2nd Cir. 1986) (filing of unfounded charges does not violate the constitution if the inmate was afforded due process to rebut or defend against the charges). Allegations that prison officials did not follow appropriate policy are also insufficient to assert a valid constitutional claim.  Brewster v. Dretke, 587 F.3d 764, 768 (5th Cir. 2009), Danser v. Stansberry, 772 F.3d 340, 344 (4th Cir. 2014).

To prevail on a due process claim such as the one pending before this Court, an inmate must first make a threshold showing that the deprivation of which he complains impacted a liberty interest.  Portley-El v. Brill, 288 F.3d 1063, 1065 (8th Cir. 2002); Meachum v. Fano, 427 U.S. 215, 223 (1976).  A protectable state-created liberty interest is "generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give

rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484 (1995) (citations omitted).

Assuming Plaintiff suffered the loss of a state-created liberty interest to which due process protections attends, Defendants are entitled to summary judgment because the record establishes that Defendants did not violate Plaintiff's due process rights. A decision by a prison disciplinary board satisfies due process if <u>some</u> record evidence supports the board's decision. Courts are not required, in civil claims, to review the entire record, weigh evidence, or assess witness credibility. Superintendent, Mass. Corr. Inst. v. Hill, 472 U.S. 445, 454, 455-56 (1985). A court may only overrule a disciplinary board's findings when they are completely unsupported by evidence or based on a completely arbitrary and capricious decision. Id. at 457.

In the context of a prison disciplinary hearing involving inmate infractions, courts have held that due process requires only that the prisoner be given "(1) advance written notice of the disciplinary charges; (2) an opportunity, when consistent with institutional safety and correctional goals, to call witnesses and present documentary evidence in his defense; and (3) a written statement by the factfinder of the evidence relied on and the reason for the disciplinary action." Hill, 472 U.S. at 454 (citing Wolff v. McDonnell, 418 U.S. 539, 563-67 (1974)).

Here, the record establishes as a matter of law that Plaintiff's due process rights were not violated. It is undisputed that Plaintiff was provided notice of the charges and the right to a hearing and an opportunity to defend the charges. In response to the summary judgment motion, Plaintiff has submitted nothing to rebut Defendants' record evidence showing that his due process rights were not violated. For all the foregoing reasons, this Court will grant summary judgment dismissing Plaintiff's due process claim based on his allegations that he was wrongly

charged with prison infractions and that he was not afforded due process before being found guilty of the infractions.

**4. Plaintiff's First Amendment Retaliation Claim Related to Plaintiff's Prison Infractions and Security Classification**

The Court next addresses Plaintiff's related First Amendment retaliation claim based on his contention that Defendants charged him with disciplinary infractions and also wrongly placed him in a security risk classification in retaliation for filing grievances, in violation of his rights under the First Amendment.

Here, Plaintiff alleges that he was charged with various disciplinary infractions in retaliation for filing grievances. The record shows, however, that Plaintiff was charged with an A18 infraction for making false allegations on staff that was upheld on appeal (for an offense that occurred on June 1, 2016), an A99 infraction for an attempt class A offense, and a C11 infraction for misuse/unauthorized use of phone/mail that were upheld on appeal (for offenses that occurred on May 3, 2017). Prison officials investigated these allegations and took resulting disciplinary actions, in accordance with NCDPS policy. (Doc. No. 75-3 at ¶¶ 6-11 & Ex. C). The A18 infraction related to statements Plaintiff made, alleging Defendant Brothers had brought drugs into the prison facility. (Id. at ¶ 8). When Plaintiff was given an opportunity to address the A18 infraction during the related investigation, he provided no evidence of his innocence, nor did he deny his conduct or raise retaliation concerns. (Id.). Benjamin Carver, the disciplinary hearing officer who reviewed the infraction, has asserted in his own affidavit that he did not have access to records relating to grievances filed by Plaintiff and he did not know that Plaintiff had filed grievances against the moving Defendants before Plaintiff was charged with this A18 infraction. (Id. at ¶ 11). Moreover, Plaintiff was able to appeal these matters, and he did appeal

the A18 infraction, and the infraction was upheld on appeal.  (Id.).

Defendants have also presented evidence showing that Plaintiff received his A99 and C11 infractions as a result of his attempt to have a cell phone and drugs brought into the prison. (Doc. No. 75-7 at ¶ 6 & Ex. A).  Defendants further assert that the officer who investigated this misconduct did not know about Plaintiff's grievances related to his SRG status at the outset of the relevant investigation.  (Id.).  Plaintiff was able to appeal these matters, he did so, and the infractions were upheld on appeal.  (Ex. A, Doc. No. 75-7).  Defendants have further offered evidence on summary judgment showing that, consistent with NCDPS policy, Plaintiff was placed in restrictive housing for attempting to introduce contraband into the facility, not in retaliation for any grievances Plaintiff submitted while confined at Alexander.  (Doc. No. 75-4 at ¶ 17; Doc. No. 75-5 at ¶¶ 15 & Ex. A).  Moreover, to the extent Plaintiff alleges that any Defendant violated a NCDPS policy, alleged prison policy violations generally do not rise to the level of a constitutional violation.  See Jackson v. Sampson, 536 F. App'x 356, 357-358 (4th Cir. 2013); Joyner v. Patterson, No. 0:13-2675, 2014 WL 897121, at *4 (D.S.C. Mar. 6, 2014) ("Violations of prison policies alone do not rise to the level of a constitutional deprivation."), aff'd, 579 F. App'x 748 (4th Cir. 2015).  In sum, for the reasons stated herein, Defendants are entitled to summary judgment as to Plaintiff's claim that he was he was charged with various disciplinary infractions in retaliation for filing grievances.

Defendants are also entitled to summary judgment as to Plaintiff's claim that Defendants retaliated against him in the form of classifying him as being part of a security risk group. Defendants have presented evidence on summary judgment showing that the classification was based on objective and valid factors, and not as retaliation.  Plaintiff has not raised an issue of disputed fact as to whether his security classification was merely done in retaliation for his filing

of grievances while at Pasquotank and Alexander. Thus, Defendants are entitled to summary judgment as to this claim.

### 5. Plaintiff's Claim for Punitive Damages

Finally, Defendants seek summary judgment in their favor on Plaintiff's claim for punitive damages. Punitive damages are allowed in § 1983 claims only when the conduct "involves reckless or callous indifference to the federally protected rights of others, as well as for conduct motivated by evil intent." Cooper v. Dyke, 814 F.2d 941, 948 (4th Cir. 1987). The Court denies Defendants' motion for summary judgment as to Plaintiff's punitive damages claim at this time, as Plaintiff presented at least some evidence that the conduct of Defendants Brothers, Dula, Swain, and Chester demonstrated "reckless or callous indifference to the federally protected rights of others, as well as for conduct motivated by evil intent." In sum, summary judgment is denied as to Plaintiff's punitive damages claim.[5]

### IV. CONCLUSION

In sum, for the reasons stated herein, summary judgment motion is granted as to all claims and all Defendants except for Plaintiff's claim that Defendants Brothers, Dula, Swain, and Chester violated his First Amendment right to send and receive personal mail, and that they retaliated against him for filing grievances against them by confiscating or otherwise tampering with Plaintiff's incoming and outgoing personal mail. Furthermore, Defendants Brothers, Dula, Swain, and Chester are not entitled to qualified immunity as to this claim.

**IT IS, THEREFORE, ORDERED** that:

---

[5] Defendants' contention that "punitive damages may never be recovered from a governmental agency or its officials in § 1983 claims," citing Newport v. Fact Concerts, Inc., 453 U.S. 247, 271 (1981), is not a correct statement of the holding in Newport, which held only that a municipality is immune from punitive damages under Section 1983.

1.   Defendants' Motion to Seal Document, (Doc. Nos. 73, 77) is **GRANTED**.

Defendants Motion for Summary Judgment, (Doc. No. 73), is **GRANTED** as to

all claims and all Defendants <u>except for</u> Plaintiff's claim that Defendants

Brothers, Dula, Swain, and Chester violated his First Amendment right to send

and receive personal mail, and that they retaliated against him for filing

grievances against them by confiscating or otherwise tampering with Plaintiff's

incoming and outgoing personal mail.  All other claims and all other Defendants

are hereby dismissed.  Thus, Defendants' summary judgment motion is **DENIED**

in part and **GRANTED** in part.

2.   Plaintiff's "Motion for Leave to File Supplemental Pleading," (Doc. No. 44);

"Motion to Compel Discovery," (Doc. No. 51); "Motion Rule 46 Objecting to

Restrictions on Discovery," (Doc. No. 55), "Motion Seeking Order Requiring All

Discovery," (Doc. No. 62), "Motion Requesting Immediate Ruling on

Discovery," (Doc. No. 69), "Motion to Compel Defendants to Transport Plaintiff

to Library Facility," (Doc. No. 70), are all **DENIED**.

Signed: March 27, 2019

Frank D. Whitney
Chief United States District Judge